1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NADEZHDA GUNKO,                          No.  2:14-cv-00071-AC

12                 Plaintiff,

13          v.                                ORDER

14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
15
                 Defendant.
16

17

18          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19   ("Commissioner") denying her application for supplemental security income ("SSI") under Title

20   XVI of the Social Security Act.  Plaintiff's motion for summary judgment and the

21   Commissioner's cross-motion for summary judgment are pending.  For the reasons discussed

22   below, the court will grant plaintiff's motion for summary judgment in part and deny the

23   Commissioner's cross-motion for summary judgment.

24                          PROCEDURAL BACKGROUND

25          Plaintiff filed her application for SSI on October 30, 2009.  Administrative Record ("AR")

26   26.  Plaintiff's application was denied initially on February 10, 2010, and again upon

27   reconsideration on June 22, 2010.  Id.  On February 16, 2011, a hearing was held before

28   administrative law judge ("ALJ") L. Kalei Fong.  AR 26, 34.  Plaintiff appeared with both a client

                                            1

advocate, Svetlana Kumansky, and a translator, Alina Chekrijeva, at the hearing.  AR 26.  In a decision dated May 10, 2011, the ALJ found plaintiff became disabled on April 1, 2011, but that she was not disabled prior to that date.  AR 34.

The ALJ made the following findings (citations to 20 C.F.R. and Exhibits omitted):

> 1.   The claimant has not engaged in substantial gainful activity since the alleged onset date.
>
> 2.   Since the alleged onset date of disability, March 1, 2009, the claimant has had the following severe impairments: hypertension, lumbar degenerative disc disease, vertigo, headaches, reduced vision in the right eye, and obesity.
>
> 3.   Since the alleged onset date of disability, March 1, 2009, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4.   After careful consideration of the entire record, the undersigned finds that prior to April 1, 2011, the date the claimant become disabled, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) that involved occasional balancing and that allowed for the avoidance of climbing ladders and exposure to heights.
>
> 5.   After careful consideration of the entire record, the undersigned finds that beginning on April 1, 2011, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). She is able to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for less than two hours in an eight-hour day with appropriate breaks; sit for less than two hours in an eight-hour day with appropriate breaks; occasionally bend, crouch, reach and grasp; and very occasionally kneel. She is to avoid climbing ladders, balancing and being exposed to heights.
>
> 6.   The claimant has no past relevant work.
>
> 7.   Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. The claimant's age category has not changed since the established disability onset date.
>
> 8.   The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English.
>
> 9.   Transferability of job skills is not an issue in this case because the claimant does not have past relevant work.
>
> 10.   Prior to April 1, 2011, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

2

1

2

3

4

5

> 11.  Beginning on April 1, 2011, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> 12.  The claimant was not disabled prior to April 1, 2011, but become disabled on that date and has continued to be disabled through the date of this decision.

6    AR 26–34.

7         Plaintiff requested review of the ALJ's decision by the Appeals Council, but it denied

8    review on November 25, 2013, leaving the ALJ's decision as the final decision of the

9    Commissioner of Social Security.  AR 1–4.

10                                  FACTUAL BACKGROUND

11        Born on October 31, 1956, plaintiff was 52 years old on the date her SSI application was

12   submitted and 54 years old at the time of her administrative hearing.  AR 41, 104.  Plaintiff has

13   never engaged in substantial gainful activity.  AR 33.

14                                     LEGAL STANDARDS

15        The Commissioner's decision that a claimant is not disabled will be upheld if the findings

16   of fact are supported by substantial evidence in the record and the proper legal standards were

17   applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000);

18   Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel,

19   180 F.3d 1094, 1097 (9th Cir. 1999).

20        The findings of the Commissioner as to any fact, if supported by substantial evidence, are

21   conclusive.  See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

22   more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th

23   Cir. 1996).  "It means such evidence as a reasonable mind might accept as adequate to support a

24   conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

25   N.L.R.B., 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute

26   substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v.

27   Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted).  Although this court cannot

28   substitute its discretion for that of the Commissioner, the court nonetheless must review the

                                              3

1    record as a whole, "weighing both the evidence that supports and the evidence that detracts from

2    the [Commissioner's] conclusion." Desrosiers v. Sec'y of Health and Hum. Servs., 846 F.2d 573,

3    576 (9th Cir. 1988); see also Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

4         "The ALJ is responsible for determining credibility, resolving conflicts in medical

5    testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001)

6    (citations omitted). "Where the evidence is susceptible to more than one rational interpretation,

7    one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v.

8    Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). However, the court may review only the reasons

9    stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not

10   rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d

11   871, 874 (9th Cir. 2003). In addition, "[t]he ALJ in a social security case has an independent

12   ''duty to fully and fairly develop the record and to assure that the claimant's interests are

13   considered.''" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

14        The court will not reverse the Commissioner's decision if it is based on harmless error,

15   which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the

16   ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir.

17   2006) (quoting Stout v. Comm'r, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v.

18   Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

19                                             ANALYSIS

20        Plaintiff seeks summary judgment on the grounds that the ALJ's residual functional

21   capacity ("RFC") assessment regarding the period prior to April 1, 2011, violates Social Security

22   Rule ("SSR") 83-20.[1] The Commissioner, in turn, argues that the ALJ's findings are supported

23   by substantial evidence and are free from legal error. For the reasons discussed below the court

24   finds that the ALJ committed legal error by failing to call a medical expert to opine on the onset

25   date of plaintiff's disabling impairment as required by SSR 83-20.

26   _____

27        [1] "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless."
     Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009). The Ninth Circuit
     gives them deference so long as they do not produce "a result inconsistent with the statute and
28   regulations." Bunnell v. Sullivan, 947 F.2d 341, 346 n.3 (9th Cir. 1991).

1

A.    Legal Standards

2      SSR 83–20 provides guidance regarding the onset date of disability.  For onset in

3 disabilities of a non-traumatic origin, medical records containing descriptions of examinations or

4 treatment of the individual serve as the primary element in onset determination.  SSR 83–20.

5 Regarding slowly progressing impairments, the regulations give the following instructions:

6
> With slowly progressive impairments, it is sometimes impossible to
> obtain medical evidence establishing the precise date an impairment
7 > became disabling. Determining the proper onset date is particularly
> difficult, when, for example, the alleged onset and the date last
8 > worked are far in the past and adequate medical records are not
> available. In such cases, it will be necessary to infer the onset date
9 > from the medical and other evidence that describe the history and
> symptomatology of the disease process.
10

11 Id.

12      The regulations further state that

13
> [h]ow long the disease may be determined to have existed at a
> disabling level of severity depends on an informed judgment of the
14 > facts in the particular case. This judgment, however, must have a
> legitimate medical basis. At the hearing, the administrative law
15 > judge (ALJ) should call on the services of a medical advisor when
> onset must be inferred.
16

17 Id.

18      In DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991), the Ninth Circuit found that

19 "[i]n the event that the medical evidence is not definite concerning the onset date and medical

20 inferences need to be made, SSR 83–20 requires the administrative law judge to call upon the

21 services of a medical advisor and to obtain all evidence which is available to make the

22 determination."  Thus, failure to call on a medical expert to assist in determining the date of onset

23 when onset is not otherwise established clearly in the record is legal error.  Id. at 589–90; Quarles

24 v. Barnhart, 178 F. Supp. 2d 1089, 1096 (N.D. Cal. 2001).  "[R]egardless of how careful and well

25 supported the ALJ's inference may be . . . [w]here the evidence is ambiguous and there are

26 indications that the claimant's . . . condition was disabling prior to the [last date insured], then a

27 medical expert must be called."  Quarles, 178 F. Supp. 2d at 1096–97; see also Morgan v.

28

5

1    Sullivan, 945 F.2d 1079, 1082 (9th Cir. 1991) (reversing in part an ALJ's determination of the

2    onset date of mental disorders without the assistance of a medical expert).

3        B.    Medical History

4        Plaintiff arrived in the U.S. from Kazakhstan on February 18, 2009, and alleges that she

5    became disabled on March 1, 2009.  AR 31.  Plaintiff's medical records indicate that her first

6    doctor's visit was with Dr. Vladlen Pogorelov, M.D., at Manzanita Medical Clinic.  AR 177–78.

7    Although the records are difficult to decipher, they do clearly indicate that plaintiff suffers from a

8    cataract in her right eye.  AR 178.  Plaintiff visited Dr. Pogorelov on several other occasions in

9    July, September, October, and November 2009.  AR 170–76.  Notes taken during these visits are

10   similarly illegible.  Id.  On May 7, 2009, plaintiff saw Dr. Spencer Silverbach, M.D., for her back

11   pain.  AR 187.  Dr. Silverbach's report notes that plaintiff had mild disk space narrowing at levels

12   L3 through S1 and mild dextroscoliosis.  Id.  On July 8, 2009, plaintiff visited the Sacramento

13   Heart & Vascular Medical Associates and was seen by Dr. George Emlein, M.D.  AR 186.  In an

14   echo report generated that same day, Dr. Emlein concluded that plaintiff had normal cardiac

15   chamber size and function.  Id.

16       On November 19, 2009, Dr. Elliot S. Eisenbury, M.D., wrote a report diagnosing plaintiff

17   with a cataract in her right eye and myopia in her left eye.  AR 191–92.  Dr. Eisenbury's notes

18   indicate that surgery was contemplated but not performed, without explaining why.  Id.  Again,

19   much of Dr. Eisenbury's report is illegible.  Id.  On December 10, 2009, Dr. Pogorelov ordered a

20   balance test for plaintiff to test for vertigo.  AR 196.  Plaintiff's answers to that balance test

21   revealed that she experienced the sensation of herself spinning weekly for approximately 1 to 3

22   minutes at a time.  AR 197.  Plaintiff's responses also indicated that she had been having these

23   symptoms for several years and typically got them when she bent over or turned her head while

24   lying down.  Id.  Plaintiff described her symptoms as moderate.  Id.  Plaintiff was subsequently

25   diagnosed with vertigo on December 24, 2009.  AR 195.

26       In January 2010, Dr. James Martin, M.D., conducted an internal medicine evaluation on

27   plaintiff and made a number of findings.  AR 212–13.  Dr. Martin's report notes that plaintiff

28   complained of high blood pressure and back problems, and that she had been treated for high

blood pressure for two years and back problems for three years at that point.  Id.  Plaintiff also reported that she took ibuprofen, acetaminophen, and lotensin at the time.  Id.  In addition, plaintiff stated that she had stopped attending school after the 10th grade in Kazakhstan and could read and write in her native tongue but could not speak English.  Id.  Dr. Martin also noted that plaintiff's cardiac rate and rhythm were regular without murmurs, rubs, or gallops, and that plaintiff cooperated during the exam with minimal grimacing or vocalization of pain.  Id.  Additionally, Dr. Martin's notes indicate that plaintiff's gait was grossly normal and she was able to walk on her heels and toes.  Id.

On January 11, 2010, plaintiff went to the Sutter General Hospital emergency room complaining of abdominal pain and was seen by Dr. Stephen J. Jerwers, D.O.  AR 218–20. Dr. Jerwers noted that plaintiff had a history of hypertension and obesity and that she had been taking metoprolol, Motrin, and another unknown pain medication.  Id.  At the time of her visit Dr. Jerwers described plaintiff as not being in any acute distress, friendly, and alert.  Id. Although plaintiff did seem to have some discomfort with the exam, Dr. Jerwers noted that she generally tolerated it well.  Id.  Nevertheless, Dr. Jerwers did direct that plaintiff be admitted to the hospital on an inpatient status because an abdominal ultrasound revealed probable gallstone pancreatitis.  Id.  At the hospital plaintiff was given aggressive IV fluids and pain control with morphine.  Id.  Dr. Jerwers also noted that Dr. Jason Park, M.D., of the surgical hospitalist department agreed to consult with plaintiff concerning her probable gallstone pancreatitis.  Id.

After his examination Dr. Park opined that plaintiff was suffering from mild acute pancreatitis, which an ultrasound confirmed was likely caused by gallstones.  AR 222.  Plaintiff was then discharged to Methodist Hospital for further study and a cholecystectomy on January 13, 2010, because of insurance concerns.  AR 216–17, 319.  Although plaintiff's pancreatitis had resolved by then, the discharge report notes that surgery was still being considered.  Id.  Upon being admitted to Methodist Hospital Dr. Hung G. Hoang, M.D., ordered a consultation with one of the hospital's surgeons, Dr. Sen Jone, M.D.  AR 319.  Dr. Hoang also noted that plaintiff had a history of mild arthritis along with hypertension and obesity.  Id.  During plaintiff's consultation with Dr. Jone she was completely asymptomatic and accordingly, after

1    consulting with Dr. Jone, Dr. Hoang recommended that plaintiff be discharged to receive

2    outpatient laparoscopic surgery at a later date. AR 325–26. Dr. Hoang commented that plaintiff

3    had probably passed her gallstones, but still recommended she follow up with either him or her

4    primary care physician in one to two weeks. Id.

5          On January 21, 2010, Dr. L. Desouza, M.D., a state agency medical consultant, generated

6    a case analysis that found plaintiff had a cataract in her right eye, hypertension that was controlled

7    with medication, and back pain with mild disc space narrowing. AR 330–32. Nevertheless,

8    Dr. Desouza noted that plaintiff could perform full squats and walk on her heels and toes during

9    the examination. Id. Based on these observations and plaintiff's medical history Dr. Desouza

10   opined that her impairments were non-severe. Id. On February 10, 2010, Dr. Desouza apparently

11   re-considered his initial assessment in light of plaintiff's mild acute pancreatitis and affirmed it

12   with no changes. Id. On June 22, 2010, another state agency medical consultant, Dr. T. Nguyen,

13   M.D., generated a case analysis that was substantially the same on reconsideration. AR 365–66.

14         On April 14, 2010, plaintiff was examined by Dr. Mikhail Palatnik, M.D., who noted that

15   she was blind in her right eye and suffered from headaches. AR 381. Dr. Palatnik noted that

16   surgery had so far not been considered an option to correct plaintiff's blindness, and that he

17   would continue monitoring the situation. Id. To combat plaintiff's headaches, Dr. Palatnik

18   recommended ibuprofen and Vicodin. Id. On May 6, 2010, plaintiff was again examined by

19   Dr. Palatnik who opined that she suffered from mild disc space narrowing at L4-5 with endplate

20   sclerosis and spurring. AR 379. Dr. Palatnik also observed early arthritic changes in the

21   sacroiliac joints, with the most change on the left. Id. On May 17, 2010, plaintiff was examined

22   by Dr. George Mednik, M.D., who noticed she had multiple stones in her gallbladder and mild

23   hepatomegaly. AR 377.

24         On April 4, 2011, Dr. Christine E. Fernando, M.D., examined plaintiff and generated a

25   report detailing her abilities to do work-related activities. AR 418–30. Dr. Fernando noted that

26   plaintiff's chief complaints were bad vision, lower back pain, general pain, and dizziness. AR

27   418. During the examination, plaintiff cited an old burn injury as the source of her blindness in

28   her right eye. Id. Dr. Fernando also noted that plaintiff had diffuse tender points, including 18

out of 18 fibromyalgia tender points.  AR 421.  Dr. Fernando was unable to perform a station and

gait test because plaintiff was unable to stand on her heels or perform a tandem gait due to

dizziness.  AR 423.  Plaintiff received assistance from her husband during the exam both in

getting down from the exam table and walking.  Id.  In light of the fact that plaintiff seemed to

require assistance walking, as well as her history of falls, Dr. Fernando noted that she might

benefit from using a cane.  Id.  Based on these observations Dr. Fernando opined that plaintiff

could (1) lift and carry up to 10 pounds frequently; (2) sit for four hours both at one time and total

in an eight hour workday, but only with assistance; and (3) stand and walk for one hour both

without interruption and total in an eight hour workday, but only with assistance.  AR 425–26.

Dr. Fernando also opined that plaintiff cannot ambulate far without the use of a cane due to

dizziness, can never climb ladders, balance, stoop, crouch, or crawl, and can only occasionally

climb stairs and kneel.  AR 426, 428.  Dr. Fernando stated that plaintiff's vision is impaired, and

that she cannot read small print or stare at a computer screen for long.  AR 428.

        C.        <u>Analysis</u>

       Based on the facts set forth above, the court finds that the ALJ should have called a

medical expert to opine on the onset date of plaintiff's disability because it was not clearly

established by the medical evidence.  The ALJ's opinion bases the chosen onset date primarily on

Dr. Fernando's April 4, 2011, examination.  AR 32–33.  The ALJ's opinion summarizes

Dr. Fernando's findings as detailed above and concludes that plaintiff had the RFC to perform

light work as defined in 20 C.F.R. 416.967(b) beginning April 1, 2011.  Id.  The ALJ accordingly

concluded that plaintiff was disabled as of April 1, 2011, as directed by Medical-Vocational Rule

202.09 for someone of plaintiff's age, education, and work experience.  AR 34 (citing 20 C.F.R.

416.960(c) and 416.966).  The ALJ's opinion also refers to plaintiff's testimony at the February

16, 2011, hearing as evidence that "the claimant's overall strength has diminished while episodes

of pain have increased and dizziness has become progressively worse."  AR 32.

       The problem is that Dr. Fernando's opinion does not clearly establish the onset date of

plaintiff's disability.  Dr. Fernando's opinion is strong evidence that plaintiff was disabled **as of**

April 4, 2011, but it says nothing about what her condition was like beforehand.  What's more,

1    the ALJ's decision does not offer any explanation as to why an earlier onset date is inappropriate

2    in light of evidence that plaintiff had long-lasting, slowly-developing impairments.  The most

3    recent medical evidence the ALJ cites prior to Dr. Fernando's relates to a doctor's visit in May

4    2010, which showed "degenerative disc disease at L4-5 and early arthritic changes of the

5    sacroiliac joints," along with "minimal spondylosis of the lower thoracic spine" without any acute

6    abnormalities.[2]  AR 31–32.  The ALJ's decision does not comment on the year-long period in

7    between that visit and plaintiff's April 4, 2011, visit with Dr. Fernando.  The ALJ's decision is

8    also somewhat undermined by the ALJ's own finding that plaintiff's impairments were getting

9    progressively worse based on her February 16, 2011, testimony.  AR 32.  Plaintiff's testimony

10    implies that her impairments were slowly progressing, and that they may have become disabling

11    sometime prior to the hearing on February 16, 2011.

12         Finally, the ALJ's finding that plaintiff could perform medium work as defined in

13    20 C.F.R. 416.967(c) before April 1, 2011, is undermined by the medical evidence of plaintiff's

14    blindness in her right eye.  The ALJ's decision describes plaintiff's blindness as treatable through

15    surgery based on the belief that her blindness is caused by a cataract.  AR 30.  The ALJ's decision

16    notes that surgery was discussed, but never performed; the implication being that plaintiff could

17    receive treatment at a time of her choosing.  Id.  Unfortunately, there is little evidence to support

18    this finding in the record, and ample evidence to refute it.  The only medical record that could be

19    construed to support the ALJ's finding that plaintiff's cataract is treatable is Dr. Eisenbury's,

20    which clearly states that plaintiff suffers from a cataract in her right eye, and that surgery was

21    contemplated but not performed.  See AR 48 (citing "Ophthalmology 2-F," Dr. Eisenbury's

22    medical report).  There is nothing, however, in Dr. Eisenbury's report that indicates plaintiff's

23    blindness is actually treatable.  And what's more, other evidence points to the opposite

24    conclusion.  Dr. Palatnik's April 14, 2010, medical report indicates that surgery on plaintiff's

25    cataract was "not considered an option."  AR 381.  In addition, plaintiff herself has stated that she

26

27

28         [2] Presumably the ALJ was referring to Dr. Palatnik's reports, although the ALJ does not mention any doctor by name.  See AR 377–78.

1  has been blind since birth, and Dr. Fernando's records actually imply it may have been the result

2  of some sort of burn.  AR 418.

3       The foregoing evidence in the record shows that the onset date must be inferred from the

4  record, as the medical evidence is ambiguous.  Accordingly, the court finds that the ALJ's

5  decision not to call a medical expert to opine on the onset of plaintiff's disability violated SSR

6  83–20.

7       B.    Remand

8       Plaintiff requests that the decision of the ALJ be reversed and that the court award

9  plaintiff benefits consistent with an onset date of March 1, 2009.  The decision whether to remand

10  for further proceedings turns upon the likely utility of such proceedings.  Barman v. Apfel, 211

11  F.3d 1172, 1179 (9th Cir. 2000).  In this matter, the court concludes that outstanding issues

12  remain that must be resolved before a determination of disability can be made.  Pursuant to this

13  remand, the ALJ shall call a medical expert to testify to the date on which plaintiff's physical

14  impairments became disabling.

15                          CONCLUSION

16       In light of the foregoing, IT IS HEREBY ORDERED that:

17       1.  Plaintiff's motion for summary judgment (ECF No. 13) is granted in part;

18       2.  The Commissioner's cross-motion for summary judgment (ECF No. 14) is denied; and

19       3.  This matter is remanded for further proceedings consistent with this order.

20  DATED: August 6, 2015

21  _____

22  ALLISON CLAIRE
    UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

                          11